**LA RAZA UNIDA et al., Plaintiffs,**

v.

**John A. VOLPE et al., Defendants.**

**No. C–71 1166.**

United States District Court,
N. D. California.

Nov. 9, 1971.

Educational Fund, San Francisco, Cal., Vernon W. Salvador, Roberto Gonzalez, Stephen Ronfeldt, Legal Aid Society of Alameda County, Oakland, Cal., Gilbert Martinez Dorame, Centro Legal de La Raza, Healdsburg, Cal., J. Anthony Kline, Public Advocate, Inc., San Francisco, Cal., Stephen P. Berzon, National Housing and Economic Development Law Project, Earl Warren Legal Institute, Berkeley, Cal., Phil S. Berry, Oakland, Cal., R. Frederic Fisher, San Francisco, Cal., for plaintiffs.

Donald M. Velasco, Robert R. Buell, Norval Fairman, San Francisco, Cal., for California Highway Comm., California Dept. of Public Works, J. A. Legarra, Chief Highway Engineer, State of California.

John W. Scanlon, City Atty., Hayward, Cal., for Leo Howell, Mayor of the City of Hayward, Cal., R. E. Doran, City Manager of City of Hayward.

Asst. U. S. Atty., Frances D. Boone, San Francisco, Cal., for John A. Volpe, Secretary of Transportation for United States, Donald E. Trull, Fed. Div. of Engineering, Dept. of Transportation.

## MEMORANDUM AND ORDER

PECKHAM, District Judge.

### I. Facts

This is a class action complaint for declaratory and injunctive relief in regard to State Project 238, a proposed highway of 14 miles that will pass through Hayward, Union City, and Fremont.

The system of roads involved here is the federal-aid primary highway system. (There are four federal-aid systems, the other three being interstate, urban, and secondary.) California normally receives approximately fifty million dollars per year for work on the primary system; this money is available on a 50–50, State-federal sharing basis.

Pursuant to 23 U.S.C. § 103, federal approval at various stages of highway design and construction is required before the state can receive federal funds.

Mario Obledo, Miguel Angel Mendez, Mexican-American Legal Defense and·

First the state must approve a vague corridor for the highway; this step is called *systems approval.* *Location approval* is the second step in project development; at that time the route within the previously defined corridor is established. Federal approval is required here.

Pursuant to 23 U.S.C. § 106(a) and Policy and Procedures Memorandum (PPM) 20–8, the State Highway Department must obtain *design approval* and subsequently approval of *plans, specifications, and estimates* (P, S, and E) to be eligible for federal funding. The last approval stage is *construction approval,* at which time the state can receive federal funds. The state must have complied with certain requirements along the way in order to obtain the staggered approvals.

Prior to location approval the State must have held a public hearing, at which time a "corridor" is agreed upon. 23 U.S.C. § 128. Public hearings for the overall route location were held on November 14, 1960 and on April 14, 1961 in Hayward. Additional hearings for the portions in Fremont and in Union City were held on September 29, 1965 and on April 20, 1967, respectively. Plaintiffs allege that these meetings failed to comply with the requirements of 23 U.S.C. § 128 and Policy and Procedure Memorandum 20–8.

On October 5, 1965, the California Department of Public Works entered into a "freeway agreement" with the City of Hayward. In that agreement, the City approved that portion of Route 238 which would pass through Hayward and agreed to close certain city streets when necessary to facilitate construction of the highway. The City also agreed to maintain and repair frontage roads built by the State. The Department of Public Works has not yet entered into an agreement with Union City, as Union City has refused to approve any extension of Route 238 within its city limits.

On November 4, 1966, the Federal Division Engineer for California gave federal "location approval" for Route 238. A key question here is what significance should be attached to this location approval. As stated above, this approval was the initial action necessary to qualify Route 238 for federal funds. State highway officials must still obtain federal design approval, P.S. & E. approval, and construction approval before the federal government is committed to finance construction. No such approvals have taken place.

The State has not requested, nor has it obtained, any federal funds for this project. There is a dispute as to whether the State will eventually request federal funds, plaintiffs saying "definitely" and defendants saying "probably not".

The State has already acquired a significant amount of land in Hayward—approximately 30–40% of the land it will need for the highway in that area. As a result of the State acquisition of land (and housing) in Hayward, persons residing on the right-of-way have been encouraged to leave and have left the area. There is a dispute as to the number of people who have left as "voluntary relocatees." Virtually no land has been purchased as yet in Union City or Fremont.

Plaintiffs have brought several causes of action to this court, seeking for the most part declaratory and injunctive relief. Under the first cause of action, they seek (a) a declaratory judgment that plaintiffs and their class are "displaced persons" under the Uniform Relocation Act, and that federal and state defendants do not have a satisfactory relocation program as required by the statutes; (b) an injunction enjoining the State defendants from acquiring any more property for right-of-way under the project and enjoining the federal defendants from granting any further approval of the project or providing funds for the project until a satisfactory relocation assistance program is devised; and (c) an order compelling state and federal defendants to show cause why funds committed to or available for the

project should not be allocated for the construction or rehabilitation of housing units.

Second, plaintiffs seek a declaratory judgment and injunction against the City of Hayward in regard to replacement housing problems.

Third, plaintiffs allege that forcing the plaintiffs to confront a discriminatory and very tight housing market violates the equal protection clause of the fourteenth amendment, and seek relief consistent with this allegation.

Fourth, plaintiffs seek a declaratory judgment that the project falls within the National Environmental Policy Act and that defendants have failed to comply with the Act, as well as an injunction both preventing State defendants from acquiring any more land for the project and forbidding the federal defendants from giving further approval to the project until the NEPA is complied with.

Fifth, plaintiffs seek similar relief under § 4(f) of the Department of Transportation Act of 1966 [49 U.S.C. § 1653(f)] and § 138 of 23 U.S.C., both of which deal with the environment and which require the Secretary to minimize the harm to the environment after first assuring himself that no viable alternatives exist.

Sixth, plaintiffs allege that various hearing requirements have not been satisfied and that all work and approval of the project should be enjoined until the hearing requirements are complied with.

Seventh, plaintiffs further allege that the failure to hold adequate public hearings constitutes a violation of due process. They seek relief consistent with this allegation.

In an amendment to their complaint, plaintiffs claim that the state defendants are in violation of two State laws: the Ralph Act (Streets and Highways Code §§ 135.3–135.7) and the State Environmental Quality Act of 1970. The Ralph Act establishes a program for providing new or refurbished housing to "low-income individuals and families" who re-

side in an "economically depressed area." Plaintiffs seek a mandatory injunction under the Ralph Act and declaratory relief and an injunction under the State Environmental Quality Act of 1970.

## II. Defendants' Motion to Dismiss

### A. Jurisdiction over the Person

██ Both the state and federal defendants claim that sovereign immunity prevents the court from assuming jurisdiction here. In a condemnation setting the state normally cannot be enjoined from acquiring land. In the present case, however, there is a question as to (1) the constitutionality of the state action, and (2) whether the officials involved have complied with state and federal statutes. Under Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), these two situations are generally considered exceptions to the sovereign immunity doctrine. A state official who exceeds his authority or who violates the Constitution is not covered by the protective mantle of sovereign immunity. See, e. g., Urbano v. Board of Managers, 415 F.2d 247 (3d Cir. 1969).

██ In regard to the federal defendants, several cases, most notably Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), indicate rather strongly that if the federal official exceeds the authority vested in him sovereign immunity does not apply, under the rationale that the person, not the sovereign, is being sued. Plaintiffs allege that the federal officials have not complied with statutory requirements; thus, sovereign immunity does not protect the federal officials here. See also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

### B. Jurisdiction Over the Subject Matter

In most of the environmental protection and housing displacement cases where an injunction has been sought, the Secretary involved had already approved

federal funds for the project. See, e. g., Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Western Addition Community Organization v. Weaver, 294 F.Supp. 433 (N.D.Cal.1968); Citizens for Hudson Valley, the Sierra Club v. Volpe, et al., 425 F.2d 97 (2 Cir. 1970), cert. denied Parker v. Citizens Committee for Hudson Valley Committee, 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970). In the present case, however, no federal funds have been contributed or authorized. Defendants argue that the project is therefore not a "federal-aid highway", and that the federal statutes and regulations do not apply until the project becomes a "federal-aid highway." Consequently, defendants have moved to dismiss plaintiffs' first and fourth causes of action on the grounds that plaintiffs have failed to state a claim upon which relief can be granted.

If a highway project is determined to be a "federal-aid highway", certain restrictions will eventually attach to the project against both the State and federal governments. For example, there must be (1), adequate hearings prior to location approval (23 U.S.C. § 128); (2) an adequate relocation assistance program with replacement housing (23 U.S.C. § 502, §§ 205, 210 of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, DOT Instructional Memorandum (IM) 80–1–68, IM 80–1–71); and (3) assurances and determinations that any adverse consequences to the environment have been considered and deemed necessary, in light of possible alternatives. (§ 138 of 23 U.S.C., § 4(f) of the Department of Transportation Act of 1966, and DOT Order 5610.1).

Defendants argue that while a project becomes part of the federal-aid highway system upon location approval, the various restrictions do not apply until federal funds have been approved or federal participation is assured. Since Project 238 has received only location approval, the federal requirements, according to defendants, do not yet apply. Any relief should be limited to an injunction preventing the Secretary of Transportation from giving his approval to further stages of the project until the state complies with the federal regulations. Plaintiffs, on the other hand, seem to argue that the statutes and regulations apply either upon location approval or when federal participation becomes inevitable.

Much of the argument on defendants' motion to dismiss has centered around semantic distinctions, but this court believes the basic issue to be as follows: do the federal regulations and statutes apply to a highway project upon location approval, construction approval, or some intermediate point when federal participation is assured?

One may conceptualize the problem as follows: there are three types or groups of highway projects. The first consists of those highways for which federal funds have been approved or are immediately sought. The parties agree that highways in this group are federal-aid highways. Federal participation here is apparent, as federal funds have been appropriated or are about to be appropriated to the project.

The second group involves those state highways constructed without federal funds, and for which federal participation has never been sought, at any level. Congress very likely possesses the power to regulate the construction of these highways; [1] but one would be distorting the language of the statutes and regulations if one were to hold that the statutes and regulations apply to these highways.[2] It seems rather apparent that these "group II" highways are not federal-aid highways.

---

1. See e. g., Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

2. For example, under § 103 the federal-aid primary highway system within a state can be no more than 7% of the total mileage of a state highway system.

The third group of highways are those projects that may eventually receive federal funds. Normally there may be six to eight years between the corridor public hearing and construction approval. It is rather difficult to predict six years ahead of time whether or not federal funds will be needed; consequently, most states keep open the option on expensive projects by securing federal approval at various stages, in compliance with federal statutes.

The crucial question before this court is which of these "group III" projects are "federal-aid highways". As stated above, the state and federal defendants concede that a project becomes part of the federal-aid highway system upon location approval; they assert, however, that the statutes and regulations do not apply until the state actively seeks federal funds. Only at that point does a project become a "federal-aid highway" for the purpose of applying the statutes and regulations.[3] Plaintiffs seem to argue that a project becomes a federal-aid highway—and the federal regulations apply—when federal funding is highly likely or inevitable, or when the state indicates a definite intention to seek federal funds. (See Plaintiffs Supplemental Memorandum of September 13, 1971 at 19–23).

Both sides cite as authority Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 446 F.2d 1013 (5th Cir., 1971); but that case is distinguishable from the one before us. In the *Conservation Society* case, the federal government had indicated at an early stage its intention to supply funds to the project. In the present case the state defendants have not received such assurances; indeed, the state asserts that it is highly unlikely that it will seek federal funds. In short, unlike the *Conservation Society* case, federal funding is far from "inevitable" here.

The state defendants cite a recent case to support their proposition that a project does not become a federal-aid highway—and the statutes do not apply—until federal funds are requested. Northeast Area Welfare Rights Organization v. Volpe, No. 3437 (D.Wash.1970). In that case, however, the project had not even received location approval, the most basic requirement for remaining eligible for federal funds. Unlike Project 238, the project in that case falls within "group II".

■ The court believes that for the purpose of applying the various federal statutes and regulations a federal-aid highway is any project for which the state has obtained location approval. The state should not have the considerable benefits that accompany an option to obtain federal funds without also assuming the attendant obligations. Any project that seeks even the possible protection and assistance of the federal government must fall within the statutes and regulations.

Several factors have convinced this court that the various federal restrictions are to apply against the defendants immediately. First, Congress has issued extremely strong policy statements against displacement and environmental destruction. 23 U.S.C. § 501 reads as follows:

> Congress hereby declares that the prompt and equitable relocation and reestablishment of persons, businesses, farmers, and nonprofit organizations displaced as a result of the Federal highway programs and the construction of Federal-aid highways is necessary to insure that a few individuals do not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole. Therefore, Congress determines that relocation payments and advisory assistance should be pro-

---

3. In other words, a project can be part of the federal-aid highway system but not be a federal-aid highway until federal funds are approved. This semantic distinction merely disguises the crucial issue: when do the federal statutes and regulations apply to a project?

vided to all persons so displaced in accordance with the provisions of this title.

Section 201 of Title II of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 reads as follows:

The purpose of this title is to establish a uniform policy for the fair and equitable treatment of persons displaced as a result of Federal and federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole.

Section 138 of 23 U.S.C. reads as follows:

It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After the effective date of the Federal-Aid Highway Act of 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

Section 101 of the National Environmental Policy Act (NEPA) reads as follows:

Sec. 101. (a) The Congress, recognizing the profound impact of man's activity on the inter-relations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this Act, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintending consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

Section 4(f) of the Department of Transportation Act of 1966 (DOT Act of 1966) is substantially the same as § 138 of 23 U.S.C.

The legislative history of the Federal-Aid Highway Act of 1968, the Uniform Relocation Assistance Act of 1970, Section 4(f) of the DOT Act of 1966, and the National Environmental Policy Act of 1969 shows an intense concern by the Congress over the problems of highway displacement and environmental protection. Prior to 1968, for example, the state was not required to make relocation payments to persons displaced by federal-aid highway projects. The 1968 Act required such payments, and the 1971 Act raised the level of such payments. See §§ 505, 506 of 23 U.S.C. and §§ 202, 203 of the Uniform Relocation Assistance Act of 1970. See also 1968 U.S. Code Congressional and Administrative News, pp. 3482–3539. Moreover, the 1968 and 1970 Acts both provide for federal advances for relocation payments before construction approval. See § 504 and § 208, with accompanying provisions. It seems rather clear to this court that Congress was well aware of the realities and hardships of highway displacement when it passed these acts, and that the main thrust and purpose of the 1968 and 1970 Acts was to protect displaced persons even before construction.

One reaches similar conclusions when examining the legislative history of the various environmental statutes and regulations; but one need not search that far to discover the Congressional intent here. NEPA, 23 U.S.C. § 138, and § 4 (f) of the DOT Act of 1966 state in the *strongest* terms the importance that Congress attaches to environmental protection. As Justice Black stated in his concurrence in *Overton Park*, 401 U.S. at 421, 91 S.Ct. at 826, 28 L.Ed.2d at 156,

That congressional command [23 U.S.C. § 138] should not be taken lightly by the Secretary or by this Court. It represents a solemn determination of the highest law-making body of this Nation that the beauty and health-giving facilities of our parks are not to be taken away for public roads without hearings, fact-findings and policy determinations under the supervision of a Cabinet officer—the Secretary of Transportation.

It is obvious, then, that strong federal policies exist towards adequate relocation assistance and protection of the environment.

A second factor this court believes significant is the language of the statutes and regulations themselves. By their very wording the statutes and regulations in question seem to apply to federal-aid projects *before* money has been appropriated and as early as location approval. Section 101(6) of the Uniform Relocation Assistance Act defines a displaced person as

any person who, on or after the effective date of this act, moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance.

The House Report accompanying the Bill describes this section as follows:

If a person moves as a result of such a notice to vacate, it makes no difference whether or not the real property actually is acquired.

It is immaterial whether the real property is acquired before or after the effective date of the bill, or by Federal or State agency; or whether Federal funds contribute to the cost of the real property. The controlling point is that the real property must be acquired for a Federal or Federal financially assisted program or project. For example:

(a) A number of State highway departments frequently acquire rights-of-way for Federal-aid highways . . with non-Federal funds, and seek Federal financial assistance only for the actual contruction work. Persons required to move from such rights-of-way are recognized as displaced persons under the relocation provisions of the Federal-Aid Highway Act of 1968 and this bill affirms that principle.

1970 U.S. Code Congressional and Administrative News, p. 5853.

DOT Instructional Memorandum (IM) 80–1–71(6) states that the regulations for displacement from highway projects apply to "any person who as of January 2, 1971 has not been displaced by any highway project on which federal-aid highway funds or other federal funds are or will be used."

IM 80–1–71(7) also restricts the state at *any* phase of the project, not simply after federal funds have been appropriated.

"7.a. No State highway department shall be authorized to proceed with any phase of any project which will cause the relocation of any person, or proceed with any construction project concerning any right-of-way acquired by the State without Federal participation and coming within the provisions of paragraph 6a of this memorandum until it has furnished satisfactory assurances on a statewide basis that:

(1) relocation payments and services were or will be provided as set forth in this memorandum;

(2) the public was or will be adequately informed of the relocation payments and services which will be available as set forth (below)."

IM 80–1–71(12) provides as follows:

States shall establish a relocation assistance advisory services program in order to provide the maximum assistance possible to persons required to relocate because of a Federal or Federal-aid highway program.

IM 80–1–71(15) provides as follows:

The division engineer shall not authorize the state to proceed with negotiations on any project which will cause the relocation of any person until the State has submitted and he has approved the project assurances as provided for in paragraph 7b of this memorandum and the relocation plan required by subparagraph "b" below.

There is also strong evidence that the environmental regulations are to apply immediately. DOT Order 5610.1 indicates that 4(f) statements are required for any formal approval by the Secretary. Paragraph 4(A) provides as follows:

The requirements in this order . . calling for either a negative declaration or a statement pursuant to Section 102(c) of the NEP Act *apply to, but are not limited to,* the following . . . :

all grants, loans, contracts, . . . plans, . . . formal approvals (e. g., of nonfederal work plans) . . . [emphasis added].

Paragraphs 3(c) (3) of the definitional guidelines that accompany DOT Order 5610.1 states that "federal actions" (that is, those programs to which the regulations apply) include "approval of State highway programs and plans prior to grant of money."

Finally, paragraph 1 of the definitional guidelines states "When there is doubt whether or not to prepare a statement it should be prepared."

From the regulations alone it appears to this court that 4(f) statements and adequate relocation assistance programs are required before location approval, prior to federal funding of a project.

Finally, in addition to the strong policy statements and the wording of the statutes and regulations, common sense dictates that the federal protective devices apply before federal funds are sought. It does little good to shut the barn doors after all the horses have run away. If the federal statutes and regulations are to supply any protection at all it must be prior to the time the residents have left and the deleterious effects to the environment have taken place. All the protections that Congress sought to establish would be futile gestures were a state able to ignore the spirit (and letter) of the various acts and regulations until it actually receives federal funds.[4] Given the realities of actual highway displacement and construction, the statutes and regulations must apply immediately or their purpose will be frustrated.

■ Plaintiffs have demonstrated that Project 238 is a federal-aid highway project, and this court now holds that Sections 205 and 210 of the Uniform Relocation Assistance Act of 1970, § 4(f) of the Department of Transportation Act of 1966, 23 U.S.C. § 138, and various supporting statutes and regulations *presently* apply against the State and federal defendants. Consequently

the motion by the State and federal defendants to dismiss the first and fourth causes of action for failure to state a claim upon which relief can be granted must be denied.[5]

\* \* \*

The City Manager and Mayor of the City of Hayward have also moved to dismiss for failure to state a claim upon which relief can be granted. Plaintiffs basically assert two theories for holding these defendants responsible for possible violations of federal regulations: (1) The Freeway Agreement dated October 5, 1965 between the State of California and the City of Hayward links the City with any wrongdoings by the State; (2) the City has an obligation under 42 U.S.C. § 1451(c) to increase the supply of low-cost housing.

■ Neither of plaintiffs' theories is valid here. Plaintiffs first want this court to enjoin the City from carrying out its part of the highway agreement, which is to close certain city streets in order to facilitate construction. Such an injunction, however, would be both inadequate and unfounded. If the City refuses to close the streets the State, at obvious inconvenience, could build the highway anyhow.[6] But even if this were not so, the municipal defendants have done nothing to justify such an injunction. The City of Hayward has simply entered into an agreement with the State—not the federal government—to assist in some way in the construction of Project 238. The submitted affidavits and exhibits have shown that the City receives very little benefit from such an agreement. In some cases a city

---

4. Indeed, we have seen what happens when a court refuses to apply the protections at an early stage of construction. See Triangle Improvement Council v. Ritchie, 429 F.2d 423 (4th Cir. 1970), cert. dismissed as improvidently granted, 402 U.S. 497, 91 S.Ct. 1650, 29 L.Ed.2d 61.

5. In the *Conservation Society* case the Fifth Circuit held that once a project is considered a federal-aid highway, and the federal statutes and regulations apply to the project, these statutes and regula-

tions will continue to apply even if the project is financed completely by state funds. The court believes it is unnecessary to consider at this time whether the federal protective devices would continue to apply if the State forecloses the possibility of federal assistance. As long as the State remains eligible for federal assistance, the project will be considered a federal-aid highway and the various federal regulations and statutes apply.

6. See California Streets and Highways Code Sections 100.1 and 100.2.

might be bound through an "agency" theory, but this is not such a case. The thrust of plaintiffs' complaint is directed against the State; it is unnecessary and confusing to join the municipal defendants to the action.

██ Plaintiffs' third cause of action, which alleges a violation of 42 U.S.C. § 1451 by the municipal defendants, must also be dismissed. Section 1451 is an urban renewal statute which may impose upon a city that has entered into a contractual agreement for urban renewal funds the duty to increase the supply of low-cost housing. Unlike West v. Housing Authority of the City of Atlanta, No. 13571 (N.D.Ga. 1971) and Ley v. Shell Oil Co., et al., No. C–71 1645 R.F.P., which raise questions concerning the scope of § 1451(c), there is no contractual agreement between the city and the federal government here; nor is this an urban renewal project. Moreover, the relevant statutes dealing with highway relocation—23 U.S.C. §§ 501–11, and the Uniform Relocation Assistance Act of 1970—impose no obligation upon the city to *increase* its supply of low-cost housing.

## C. Standing

██ Defendants allege that all of the plaintiffs lack standing to raise the environmental issues in this suit. Certainly the plaintiffs residing in Hayward, Union City and Fremont have standing, as they shall be affected directly by any activities adverse to the environment. It is *their* parklands and forests that may be damaged. The State implies that plaintiffs must show that they own property adjacent to the park areas; the court disagrees. A showing that they use the park and live nearby is enough to satisfy the standing requirement for these plaintiffs.

Whether the Sierra Club has standing in this case is a more difficult question. Despite the Club's well-known history as a vigorous advocate of environmental causes, recent Ninth Circuit decisions would seem to preclude standing in this case. Sierra Club v. Hickel, 433 F.2d 24, cert. granted, 401 U.S. 907, 91 S.Ct. 870, 1970; Alameda Conservation Assn. et al. v. State of California et al., 437 F.2d 1087 (1971). These cases contrast sharply with decisions in several other circuits. See Citizens Committee for Hudson Valley, the Sierra Club v. Volpe et al., 425 F.2d 97 (2d Cir. 1970), cert. denied 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970); Environmental Defense Fund, Inc. v. Hardin, 138 U.S. App.D.C. 391, 428 F.2d 1093 (1970); West Virginia Highlands Conservancy v. Island Creek Coal Co., 441 F.2d 232 (4th Cir. 1971). In order to resolve this conflict the Supreme Court has granted certiorari in *Sierra Club v. Hickel.*

In light of certain agreements by the parties and the history of the Sierra Club as a dedicated speaker for environmental causes, this court will grant the Sierra Club "conditional standing" to litigate this case, pending the Supreme Court decision in *Sierra Club v. Hickel.*

## D. Class Action Questions

██ The federal defendants allege that plaintiffs have failed to satisfy the requirements for a class action under Rule 23(a) of the Federal Rules of Civil Procedure. Specifically, they assert that "there are not questions of law or fact common to the class, nor are there typical claims or defenses common to all the plaintiffs or the class they purport to represent." (Federal Defendants' Brief of August 17, 1971 at p. 21). The court disagrees. See Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968).

## III. Plaintiff's Motion for Preliminary Injunction

From the above discussion it is apparent that Project 238 became a federal-aid highway project on November 4, 1966, the day it received federal location approval. Such status necessarily entails certain responsibilities with regard to displaced persons and environmental protection. The various statutes and regulations apply immediately; they are not suspended until the State applies for federal funds. The court must now de-

termine (1) whether the State has satisfied the requirements of the statutes and regulations, and (2) if it has not satisfied these requirements, whether a preliminary injunction should issue.

[11] The various statutes and regulations, as discussed above, impose numerous constraints upon both the State and Federal governments in the cases of federal-aid highway projects. From various affidavits it appears that a substantial number of people have been displaced or are about to be displaced from the project. From the evidence thus far presented it also appears that, despite sincere efforts, the State has an inadequate relocation assistance program, as defined by § 205 of the Uniform Relocation Assistance Act of 1970 and IM 80–1–71. The State, albeit in good faith, has failed to comply with the federal relocation statutes and regulations.

It is the determination of this court that a preliminary injunction should issue for these violations. Plaintiffs satisfy all of the requirements for a preliminary injunction: [7]

1. The harm to plaintiffs and the class they represent is clearly irreparable. One who is forced to vacate his chosen neighborhood or city, to sever long-standing friendships, to confront a tight and possibly discriminatory housing market, and to incur other indignities that are likely to be present here suffers severe and irreparable injury. Only after legislatively-authorized procedures have been complied with should displacement be permitted.

2. There is a high probability that plaintiffs will prevail on the merits.

3. The public interest favors the granting of the injunction. See 23 U.S.C. § 501, IM 80–1–71, and Policy and Procedure Memorandum 20–8.

4. Any harm to defendants is clearly outweighed by the harm to plaintiffs were the preliminary injunction not issued.

The environmental regulations can be approached in a similar fashion. Though the State presently is attempting to compile 4(f) statements, no such statements have yet been submitted. As was discussed above, such statements are required when a project is likely to have an impact on the environment. See DOT Order 5610.1.

From the evidence presented it appears that Project 238 will have a most significant impact on the environment. The highway will probably cut through three parks: the Hayward Botanical Gardens, Hayward Memorial Park, and Fremont Central Park. There is also evidence that certain portions of Project 238 are proposed to be constructed over known fault areas. See Plaintiffs' Exhibit 42, affidavit of Professor George P. Simonds. These were the types of factors Congress deliberately wanted to be taken into account when it said in § 4(f) and § 138:

It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After the effective date of the Federal-Aid Highway Act of 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such offi-

7. See 7 Moore, Federal Practice ¶ 65.04.

cials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

The court finds that a § 4(f) statement is required for the 238 Project at the present stage of development. No more land should be acquired nor should any action be undertaken which would materially affect the environment until 4(f) statements have been prepared and the Secretary is satisfied that (1) no feasible alternative route exists, and (2) any harm to the environment has been minimized.[8]

### PRELIMINARY INJUNCTION

1. It is hereby ordered, adjudged, and decreed, that pending the further Order of the Court, state defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them or any of them are, each and all, hereby restrained and enjoined from:

(a) Acquiring any further real property in the Cities of Hayward, Union City, and Fremont, California, for right-of-way for the Route 238 Project; and

(b) Attempting to remove, threatening to remove, or acting to remove (by initiating contacts or making solicited or unsolicited offers or otherwise) any resident of premises located on or near proposed right-of-way for the Route 238 Project; and

(c) Undertaking any other actions whatsoever in connection with the Route 238 Project that would materially affect the environment.

2. It is further hereby ordered, adjudged and decreed, that commencing immediately, and thereafter until the further order of this Court, defendant Volpe, his officers, agents, servants, employees, attorneys, and all persons in active concert with them or any of them, each and all, are hereby restrained and enjoined from continuing to accord or to accord any approval to the Route 238 Project or plans, maps, or other documents connected therewith.

3. It is further hereby ordered, adjudged and decreed, that no person restrained and enjoined by this Preliminary Injunction shall undertake to avoid compliance by any indirection.

4. Any person enjoined by this Preliminary Injunction may move for termination upon showing that Federal and State defendants have fully and reasonably complied with Sections 205 and 210 of the Uniform Relocation Assistance and Land Acquisition Policies Act of 1970, P.L. 91–646, 84 Stat. 1894; Section 502(3) of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 502(3); Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f); Section 138 of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138, and all Federal regulations promulgated under each of said statutes.

8. Plaintiffs also claim that (1) defendants' forcing them and members of their class to confront an allegedly discriminatory housing market violates the equal protection clause of the Fourteenth Amendment (third cause of action); (2) defendants have violated the National Environmental Policy Act of 1969 (fourth cause of action); (3) defendants have failed to hold proper hearings in compliance with 23 U.S.C. § 128 (sixth cause of action); (4) the failure to hold adequate hearings denied plaintiffs due process of law (seventh cause of action); (5) state defendants have violated the Ralph Act, California Streets and Highways Code §§ 135.3–135.7 (eighth cause of action); and (6) state defendants have violated the State Environmental Quality Act of 1970, California Public Resources Code, § 21000 et seq. (ninth cause of action). The complex questions raised by these claims need not be considered at this point in the litigation, as a preliminary injunction is sufficiently supported by other considerations.