## CITIZENS FOR BALANCED ENVIRONMENT AND TRANSPORTATION, INC., successor In Interest of Committee to Stop Route 7, et al.

v.

### John A. VOLPE et al.

### Civ. No. 15054.

United States District Court,
D. Connecticut.
May 10, 1974.

72. *Id.* at 102.

Haynes N. Johnson, Alphonse R. Noe, Stamford, Conn., for plaintiffs.

Element J. Kichuk, Asst. Atty. Gen., Henry S. Cohn, Asst. U. S. Atty., Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION ON PLAINTIFFS' MOTION TO EXTEND INJUNCTION

NEWMAN, District Judge.

This second phase of the Route 7 litigation in Connecticut requires decision as to whether a proposed highway from Danbury to New Milford is a "Federal

action" within the meaning of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C), in which event the preparation of an environmental impact statement (EIS) is required. In the first phase of this litigation an unincorporated association of area residents obtained an injunction preventing construction of Route 7 between Norwalk and Danbury until federal officials had complied with NEPA by preparing an EIS "covering at least a span from Norwalk to Danbury." Committee to Stop Route 7 v. Volpe, 346 F. Supp. 731, 742 (D.Conn.1972).[1]

An incorporated and renamed association of area residents, which is successor in interest to one of the original plaintiffs, has now moved to extend the scope of the original injunction to bar construction between Danbury and New Milford until adequate compliance with NEPA. The motion was precipitated by the state defendants advertisement of bids for construction of projects 34–124 and 18–95 in the Towns of Danbury and Brookfield. These projects are to be part of relocated Route 7 north of Danbury. Plaintiffs urge that the portion of relocated Route 7 from Danbury to New Milford is a "Federal action" within the meaning of NEPA because of (a) federal funds already spent, (b) the State's eligibility for future federal funding, and (c) the relationship between the portion of relocated Route 7 north of Danbury and the portion south of Danbury, which all concede is a "Federal action."[2] These contentions are appropriate for decision, whether the pending motion is considered solely as an effort to enlarge the prior injunction or as a new suit challenging the proposed new construction in an area not covered by the prior injunction. The state defendants oppose the motion primarily on the ground that the state proposes to use only state funds to construct the highway from Danbury to New Milford.

## I.

### Federal Funding

The principal federal funds relied on by plaintiff are those that have been used to construct a portion of I–84 in Danbury and a spur that connects I–84 to Route 7 north of Danbury. I–84 is a

1. The injunction barred steps to construct "any portion of relocated Route 7." 346 F. Supp. at 742. That injunction was issued in the context of a suit challenging the proposed construction of two projects located between Norwalk and Danbury, projects 161–86 and 161–93. Subsequently the state defendants sought to amend the judgment to specify that construction between Danbury and New Milford would not require an EIS if only state funds were used. This Court declined to amend the judgment, considering that issue "not ripe for adjudication." Ruling on Motions to Amend Judgment p. 5 (Sept. 5, 1972). The ruling emphasized that determination of an appropriate span to be covered by an EIS should be made after submission of the EIS deemed sufficient by the appropriate agency with opportunity to review the agency's justification for the length of highway it has elected to consider.

In retrospect, it appears that two distinct issues were not adequately separated. The first is whether the EIS required before construction of Route 7 between Norwalk and Danbury need cover only that span or must also cover the entire span from Norwalk to New Milford. The second is whether there can be construction between Danbury and New Milford without preparation of an EIS for this span. Though the two questions are somewhat related, their resolution does not turn on identical factors. The first issue will come before this Court when defendants seek to vacate the present injunction on the ground that an adequate EIS has been prepared. The second issue is squarely raised by the present controversy between the parties and requires adjudication now.

All parties appear to have assumed, correctly, that the original injunction, as clarified (?) by the subsequent Ruling on Motions to Amend Judgment, barred construction of relocated Route 7 between Norwalk and Danbury and did not resolve the issue now pending concerning construction between Danbury and New Milford.

2. The portion south of Danbury, if built, is to be financed with federal funds. The issue in the first phase of this litigation was whether NEPA applied to a federally financed highway that had somewhat progressed through the planning stage prior to the effective date of NEPA.

limited access expressway running in an east-west direction through Danbury. The state's plans call for reconstructing Route 7 to link up with I–84 from south of Danbury at a point just west of Danbury and to continue north from I–84 at a point just east of Danbury. For the three miles between the two points where Route 7 will intersect I–84, the highway will be numbered both I–84 and U.S. 7. Approximately $40 million of federal funds was used for this portion of I–84.

 The overlap of the two route designations does not mean that Route 7 north of Danbury is a federal highway for NEPA purposes. Congress has not purported to apply NEPA requirements to very highway that connects with a federally-funded highway, and the fact that the connection here involves a three-mile overlap makes no difference.

Plaintiffs direct more serious attention to the spur north of I–84, since this spur will be the southern terminus of the new Route 7 north of Danbury. Plaintiffs cite particularly $465,000 of "Federal-aid primary" money, 23 U.S.C. § 103(b), used to build a bridge at the northerly end of the spur. The spur is currently connected by two temporary ramps to the presently existing Route 7. State plans call for the removal of these ramps once the new Route 7 has been built from the spur northward. Once that occurs, cars travelling north from Danbury on new Route 7 will cross the federally-funded bridge and remain on the state-funded portion of new Route 7 for about one mile until the first exit is reached. Similarly cars coming south toward Danbury on new Route 7, after passing an exit one mile north of the bridge, will have to cross the bridge and continue on into I–84. Plaintiffs' contention is that the portion of Route 7 that the state proposes to build north of Danbury does not merely intersect with a federally-funded highway, it becomes a

federal highway because its southern end (the spur north of Danbury) is a federally-funded road.

 Whether a state-funded road is nonetheless a federal road for NEPA purposes when it is merely one segment of a federal highway is an issue to be considered subsequently in this opinion. But no matter how strict an approach one takes to "segmenting," cf. Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 446 F.2d 1013 (5th Cir. 1971) (hereafter "San Antonio"), it is simply unrealistic to consider the 14.4-mile span from Danbury to New Milford to be a "segment" improperly broken off from the federally-funded spur of less than one-quarter of a mile.

Nor does it matter that the spur and the 14-mile span become a unit from which there is no exit along the southernmost mile. Most roads link up with other roads. When I–84 was constructed through Danbury, it was obviously necessary to construct a means of connecting that highway with existing Route 7. That is what the spur and the temporary ramps accomplish. They have a use entirely independent of any future use they might serve as the southern end of new Route 7 above Danbury. Once the state builds the new Route 7 above Danbury, it is entitled to link up with the connection between I–84 and old Route 7, and neither this connection nor the elimination of the ramps to the replaced road federalizes the new state-funded road.[3]

 The only other federal funding indicated is a sum less than $50,000 of federal highway planning and research funds that were used in connection with the planning of the proposed road. The size of this expenditure and the totally preliminary purposes of the funds are too insignificant to render the proposed multi-million dollar highway a federal

---

3. This is not to suggest that the construction of the spur is entirely lacking in NEPA significance. If NEPA had been in effect when the spur was built, an adequate EIS for I–84 would have had to give sufficient consid-

eration to the environmental consequences of the spur, since it could be expected to fix with virtual certainty the southern terminus of any reconstruction of Route 7 north of Danbury.

action.[4] James River and Kanawha Canal Parks, Inc. v. Richmond Metropolitan Authority, 359 F.Supp. 611, 634, 636, n. 72 (E.D.Va.1973) (hereafter "*James River*").

## II.

### *Eligibility for Federal Funding*

More substantial is plaintiffs' claim that NEPA compliance is required because the portion of new Route 7 between Danbury and New Milford has been eligible for federal funding. State officials agree with plaintiffs that the conduct of corridor and design hearings were carried out pursuant to state requirements that are intended to be as rigorous as federal requirements. The purpose, explicitly acknowledged in the testimony of the state's deputy commissioner of transportation, is to preserve eligibility for federal funding, if anticipated state funds do not materialize.[5] The state insists, however, that a decision to rely on state funding for the Danbury-New Milford portion was made back in the 1960's and has been consistently adhered to. But the deputy commissioner agrees that even though state funds are to be used for the two projects of the Danbury-New Milford portion currently advertised for bids, the state remains eligible for federal funds to construct other projects within the Danbury-New Milford portion.[6]

Plaintiffs' contention that eligibility for federal funding requires NEPA compliance draws support from three decisions, La Raza Unida v. Volpe, 337 F.Supp. 221 (N.D.Cal.1971); Sierra Club v. Volpe, 351 F.Supp. 1002 (N.D.Cal.

1972), and *James River, supra*. La Raza Unida ruled that a highway becomes subject to "various federal statutes and regulations" at the point when location approval has been given by the Federal Highway Administration, see Policy and Procedures Memorandum · (PPM) 20–8, whether or not the state has received or even sought any federal funds. While NEPA compliance was not explicitly adjudicated, 337 F.Supp. at 234, n. 8, the opinion emphasizes the importance of the environmental policies protected by NEPA and also by 23 U.S. C. § 138.

The two subsequent cases have cited La Raza Unida approvingly, although they had no occasion to apply its holding. Sierra Club v. Volpe, *supra*, is really a segmenting case, the court concluding that a 6.3-mile portion of highway connecting long portions of federally-funded highways on either side could not be isolated from compliance with NEPA. The court also relied upon the state's disavowal of expected federal funding after the litigation had started. *James River* held that the challenged highway was not a federal highway, in part because there had been no federal location approval. Nevertheless the court explicitly endorsed La Raza Unida, warning that if a state could avoid NEPA compliance by foregoing federal funds though eligible for them after location approval, a state could ignore environmental considerations in precisely those instances where they may be most important. 359 F.Supp. at 633.

Both the state and federal defendants here seek to avoid the import of La Raza

---

4. The two projects currently advertised for bids are estimated to cost $38 million in state funds.

5. Apparently the state defendants concede that the advertisement for bids on projects 34–124 and 18–95 without prior federal approval of plans, specifications and engineering, renders these projects no longer eligible for federal funding.

6. Should the state ultimately seek federal funding for other projects between Danbury and New Milford, it may encounter the

objection that NEPA compliance has been rendered impossible by state construction of state-funded projects in the absence of an EIS. If at that point an EIS covering only the remaining projects could not realistically assess the pros and cons of building a highway whose completion and location are already predestined by the existing construction, then federal funding may not be permissible. Apparently the state prefers not to avoid that serious risk by insuring compliance with NEPA now.

*Unida* because of the fact that the state never sought nor received location approval from the FHWA for new Route 7 north of Danbury. However, there has occurred a federal approval of no less significance. Since Route 7 is part of the federal-aid primary system, the state was required to obtain federal approval of the general route to be followed by the reconstruction of Route 7. In the lexicon of federal highwayese this is known as "route revision." It was sought on November 28, 1969 (Pl.Ex. QQ) and granted on December 22, 1969 (Pl.Ex. RR).

The state defendants minimize the significance of this route revision approval. They contend that federal review of a proposed change in a federal-aid primary route "is only to determine if the highway system will retain its coordinated nature." However, Angelo Siccardi, the FHWA's division engineer, testified that the route revision approval is not only sufficient to constitute location approval within the meaning of PPM 20–8, but in fact the submission required to obtain route revision approval is more detailed than that required to obtain location approval. Moreover, both the federal and state defendants agree that projects on the Danbury-New Milford span not yet advertised for bid remain eligible for federal funding. That could be so only if the design public hearing that was held in conformity with federal requirements was preceded by location approval. See PPM 20–8(4)(b)(1).

■ Arguably a difference between "route revision" approval and location approval can be found in the likely attitude of state officials at the time each is sought. Application for "route revision" approval simply implies that the state wants to insure its eligibility for federal funding. By seeking location approval, however, the state manifests at least a tentative decision to seek federal funding. However, neither step commits the state to build the highway at all, nor to use federal funds if the highway is built, and surely neither step

commits the federal agency to supply federal funds. Moreover, determination of whether the federal government is sufficiently involved in a highway to make it a "Federal action" within the meaning of NEPA should not depend on the state of mind of a potential state applicant for funds.

■ Thus the issue must be faced as to whether NEPA compliance is required for a span of a relocated highway that has received FHWA approval to remain on the federal-aid primary system when state highway officials have taken all steps necessary to remain eligible for federal funding but have elected to use only state funds for construction. Though recognizing the force of the argument developed in *La Raza Unida*, this Court concludes that while Congress no doubt has power to require NEPA compliance in such circumstances, the existing legislation simply does not do so.

The argument in *La Raza Unida*, as echoed in *James River*, is that if NEPA does not apply to highways that are eligible for federal funding, state officials will retain the discretion to decide at any time prior to construction whether to subject themselves to NEPA requirements. Since they need not elect to take federal funds until the end of the planning and design process, they can retain the option of foregoing federal funds if NEPA compliance appears onerous. Moreover, they do not lose federal money, since these funds are invariably reallocated to other federal-aid highways within the state.

■ The contentions are all sound, but with deference I do not understand how they establish that such an option on the part of a state constitutes the highway a "Federal action" within the meaning of NEPA. Solicitude for the environment cannot substitute for legislation. Congress has not applied NEPA to all highways that the states are *eligible* to fund with federal dollars. There is no indication in this case that the FHWA has in any way induced Connecticut to reconstruct Route 7 between

Danbury and New Milford. The "route revision" approval leaves the State entirely free to proceed with the reconstruction or forego it entirely.[7]

■ The State's option to use federal dollars, though open virtually until the concrete is poured, is nonetheless an option, and the State's choice should not be restricted simply because one alternative of the option (using state dollars) might result in less adequate assessment of environmental considerations. If the highway is not a federal action, then a state's decision to avoid federal involvement cannot have the paradoxical effect of establishing federal involvement. Cases may arise where a state has developed such a partnership with the federal government in the joint decision-making as to whether and where to build a highway that a last-minute state election to use state money for construction cannot be permitted to erase the federal imprimatur already placed on the project. See *San Antonio, supra,* 446 F.2d at 1027. But that has not occurred here. "Route revision" approval plus continued conformity by state highway officials with federal requirements to preserve eligibility for federal funding is not sufficient to constitute a state-funded highway as a "Federal action" within the meaning of NEPA.

## III.

### *Segmenting*

■ Though not a "Federal action" in and of itself, the Danbury-New Milford portion of new Route 7 would be subject to NEPA requirements if it were an integral part of a "Federal action" to build a highway from Norwalk to New Milford. Plaintiffs insist this is precisely the case.

■ There is no doubt that the state plans to build a four-lane limited access expressway from Norwalk to New Milford. The Connecticut General Assem-

bly authorized the planning for such a highway in 1957 and has since authorized what highway officials hope will be sufficient bonding authority. From the state's perspective it is one highway. But the state's intention, though relevant, does not determine federal consequences. The issue is whether the portion of new Route 7 between Danbury and New Milford has independent justification or whether construction of this span is dependent upon construction of the entire highway. See *San Antonio, supra;* Arlington Coalition v. Volpe, 458 F.2d 1323 (4th Cir. 1972); Sierra Club v. Volpe, *supra; James River, supra.*

Plaintiffs rely essentially on the many documents whereby the state highway officials expressed their intention to build a highway from Norwalk to New Milford. The state defendants rely on evidence that most of the traffic on the Danbury-New Milford portion will originate and terminate in these or intermediate towns. The federal defendants, though explicitly invited to express a view with respect to the administration of important federal statutes, have said only that this is a matter for the Court's decision.

There seems little doubt that until the enactment of NEPA and particularly the injunction issued in this litigation, the state highway officials made no particular distinction between new Route 7 south and north of Danbury. To the extent the highway was thought of in two parts, the dividing line was a point near Silvermine Road in Brookfield, north of Danbury. This apparently stemmed from the fact that the state legislature authorized bonding in two stages and the first stage reached from Norwalk only to this point in Brookfield. See Conn.Gen.Stat. § 13a–185(b)(6).

Nevertheless, the demographic and traffic aspects provide sufficient independent justification for the Danbury-New Milford portion. The populations

7. No claim has been made that "route revision" approval is itself a "major Federal action" within the meaning of 42 U.S.C. § 4332(2)(C) requiring a prior EIS, even if in this case such approval had occurred after the effective date of NEPA.

of Danbury and New Milford are 53,300 and 15,400, respectively. They are the principal population centers in the area in which each town is located. State highway officials believe the traffic between these communities, and between each of them and points along the Danbury-New Milford portion, justifies the construction of an expressway linking the towns. The manager of design for the Connecticut Department of Transportation testified that the Danbury-New Milford portion should be built whether or not the Norwalk-Danbury portion was built. That view may be debated, but ultimate decision on the point is not for this Court. It is sufficient that the independent justification for the Danbury-New Milford portion is reasonable and not a sham rationalization.

 It is true, as plaintiffs contend, that construction of the portion north of Danbury will provide additional reason for construction of the portion south of Danbury. But as long as the northern portion has sufficient independent justification, it cannot be considered an indivisible part of a single highway, simply because its existence increases the likelihood of building the southern portion Again, this factor may be relevant, but it is not decisive. Construction of the Danbury-New Milford portion without NEPA compliance is not an impermissible segmenting of the Norwalk-New Milford reconstruction of Route 7.

 Though not specifically urged by plaintiffs, it might be appropriate in some cases to reach a conclusion of "Federal action" based on the cumulative effect of the various factors considered in this opinion. The federal dollars to build the spur that will connect new Route 7 to I–84 and the small amount of highway planning and research funds, the "route revision" approval by the FHWA and the state's continued eligibility for federal funding for later projects north of Danbury, and the relationship between the Danbury-New Milford portion and the Norwalk-Danbury portion may well be considered to have a greater total effect than any factor alone. The case law in this developing field has not identified with clarity the standard against which such a combination of factors is to be measured. Though the question on these facts is close, it does not appear that the federal government has played a sufficient role in the reconstruction of highway between Danbury and New Milford to make this portion of Route 7 a "Federal action" within the meaning of NEPA. The preparation of an overall EIS for "the entire Route 7 corridor" has already been ordered. Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, 362 F.Supp. 627, 638 (D.Vt.1973). Since the Danbury-New Milford portion is deemed not to be a "Federal action," an EIS for this specific portion need not be prepared prior to construction of the projects challenged by this motion to extend the prior injunction. Accordingly, that motion is denied.[8]

8. The Court declines to adjudicate the pendent claim of non-compliance with Governor Meskill's Executive Order No. 16. Neither this order, nor the recent state legislation, which the state defendants allege has superseded the executive order, Public Act 73–562, have been given any authoritative state court interpretation, and it would be most inappropriate for a federal court to adjudicate the effect of a governor's executive order in light of subsequent state legislation. *Cf. James River*, supra, 359 F.Supp. at 623.