**Roland E. HILL et al., Plaintiffs,**

v.

**William T. COLEMAN, Jr., as Secretary of Transportation of the United States of America, et al., Defendants.**

**Civ. A. No. 4499.**

United States District Court,
D. Delaware.

July 18, 1975.

See also D.C., 371 F.Supp. 1166.

Thomas Herlihy, Jr. and Morris Cohen, of Herlihy & Herlihy, Wilmington, Del., for plaintiffs.

Alan J. Hoffman, Asst. U. S. Atty., Wilmington, Del., and Francis J. Locke, Regional Counsel, Regional Federal Highway Administrator, Dept. of Transportation, Baltimore, Md., for defendant Coleman, Jr.

Johanna D. Drooz Yoffie, Deputy Atty. Gen., Wilmington, Del., for defendants Hall, Haber, Davidson and Bewick, Jr.

Joseph M. Bernstein, Asst. County Atty., for New Castle County, Wilmington, Del., for defendant Peterson.

## OPINION

LATCHUM, Chief Judge.

On October 25, 1972 plaintiffs [1] filed this action against the Secretary of Transportation of the United States [2] and against the Secretary of the Department of Highways and Transportation of the State of Delaware [3] in order to contest [4] the proposed construction of a highway facility known as the "Newark Beltway." Count I of the complaint alleged that Secretary Volpe had approved the location of the proposed Beltway and would authorize the release of federal funds despite the fact that he and defendant Mearns, as well as their respective subordinates, had not complied with all of the necessary prerequisites to "location approval" mandated by the National Environmental Policy Act of 1969 (NEPA), the Department of Transportation Act of 1966, the Federal-Aid Highway Act of 1968, and pertinent regulations thereunder.

Count II alleged that rights of way for the proposed Newark Beltway having been established, the value of plaintiffs' real estate had depreciated, first, because of uncertainty as to when construction would begin and, second, because "under the provisions of the Delaware Code and statutes" in the interim period before construction plaintiffs would be unable (1) to secure building permits in order to improve their properties or (2) to take any other action which would infringe on the proposed rights of way.

Counts III and IV alleged that construction of the proposed Newark Beltway through Christine Manor would cause the formation of a new flood plain and would irreparably diminish the market value of seven homes by $266,000.00 because of the destruction of irreplaceable septic systems and water wells. Finally, Count V alleged that the state had violated plaintiffs' procedural and substantive due process rights, in addition to United States Department of Transportation procedures, by failing to inform the Christine Manor Civic Association of state requests for federal aid for the construction of projects in the Christine Manor area.

As their relief, plaintiffs requested (1) a preliminary injunction enjoining both defendants "from proceeding further with the location of the Newark Beltway . . ." and from "approving, granting or using" any federal funds for the Beltway, (2) a declaratory judgment that the location of the Beltway "as presently proposed" "would be in violation of the constitutional, statutory, and common law rights of plaintiffs" and in violation of several statutes,[5] (3) a permanent injunction of the same scope as the preliminary injunction, and (4) judgment "directing defendants to withdraw and cancel any and all approvals of the location of the Newark Beltway project and from granting any approval in the future."

Secretary Volpe answered Count I of the complaint by specifically denying that he had given location approval to

---

1. The individual plaintiffs are property owners residing in Christine Manor, Delaware, an unincorporated residential area in New Castle County located just outside the City of Newark. The other plaintiff, Christine Manor Civic Association, is a non-profit neighborhood association.

2. John Volpe was Secretary of Transportation of the United States at the time; he was the first named defendant and his successors in office have since been substituted as party defendants in this case.

3. A. Kirk Mearns, Jr. was Secretary of the Department of Highways and Transportation of the State of Delaware at the time and he was the second named defendant; his successors in office have since been substituted as party defendants in this action.

4. Federal jurisdiction was claimed to arise under the 5th, 9th and 14th Amendments, 28 U.S.C. § 1331, 5 U.S.C. § 701 et seq., 42 U.S.C. § 4321 et seq., 23 U.S.C. § 101 et seq., 42 U.S.C. § 4601 et seq.; 28 U.S.C. §§ 2201–2202; 42 U.S.C. § 1983; 28 U.S.C. § 1343.

5. 23 U.S.C. §§ 128, 138; 49 U.S.C. § 1653 (f); 42 U.S.C. § 4332.

the Newark Beltway; he also asserted as one of his affirmative defenses that the plaintiffs' action against him was premature. Secretary Mearns answered Count I by denying that location approval had been given and asserted as an affirmative defense that the action was premature. Secretary Volpe's successor in office, Claude S. Brinegar,[6] subsequently filed a motion for summary judgment or in the alternative a motion to dismiss the complaint with respect to him on the grounds that there was no federal subject matter jurisdiction of the case and that the complaint was premature because the appropriate federal officials had not granted location approval for the Newark Beltway.[7]

Before the Court could rule on this motion, on March 15, 1973 counsel for plaintiffs belatedly informed it that Count II of the complaint was an attempt to articulate the allegation that 17 Del.C. § 147 violated the Fifth and Fourteenth Amendments of the United States Constitution because the statute purportedly operated to take plaintiffs' property without just compensation. Plaintiffs' counsel also asserted that they were requesting injunctive relief on this basis. Consequently, the Court granted plaintiffs leave to amend in order to clarify the allegations contained in Count II of the complaint and any other portion thereof.[8]

Plaintiffs did amend their complaint[9] and a three judge court was then ordered convened pursuant to 28 U.S.C. §§ 2281 and 2284.[10] The parties stipulated, with the approval of the Court, that briefing and oral argument with regard to any outstanding motions to dismiss and/or for summary judgment[11] would be postponed until after the three judge district court rendered its decision on the issue of the constitutionality of 17 Del.C. § 147.

On April 8, 1974 the three judge district court issued its opinion and order[12] in which it abstained from passing on the constitutionality of the Delaware statute but retained jurisdiction pending plaintiffs' pursuit of their remedy in the Delaware state courts afforded by 10 Del.C. § 6501, and ordered other issues raised by plaintiffs in their complaint to be disposed of by a single judge. Secretary Brinegar filed a renewed motion to dismiss the action against him and/or for summary judgment.[13] The state defendants also filed a renewed motion for summary judgment.[14] Following extensive briefing[15] and submission of numerous supporting affidavits and exhibits, the Court heard

6. On February 15, 1973 the Court entered an order substituting Mr. Brinegar for Mr. Volpe as the "federal" defendant and Clifton E. Morris for A. Kirk Mearns, Jr. as the "state" defendant. (Docket Item 12).

7. Docket Item 18, filed March 7, 1973.

8. Docket Item 39. After the Court was first informed by plaintiffs' counsel of this matter, but before the Court issued Docket Item 39, defendant Morris filed a motion for summary judgment and/or motion to dismiss (Docket Item 28), and defendant Brinegar filed a second motion for summary judgment. (Docket Item 36). In Docket Item 39, the Court also denied all pending motions without prejudice.

9. Docket Item 43. Plaintiffs added Messrs. Haber, Davidson, Bewick, Jr. and Peterson as defendants with respect to Count II only and amended Count I so as to allege that even if United States Secretaries of Transportation Volpe and Brinegar had not yet given formal "location approval" for the Newark Beltway "there has been [location] approv-

al in fact by reason of the funding of the activities carried on by the Delaware State Highway Department in connection with said Beltway."

10. Docket Item 49.

11. On October 2, 1973 defendant Brinegar had filed another motion to dismiss or in the alternative for summary judgment (Docket Item 50) while on October 3, 1973 defendant Morris and the other state defendants filed a motion for summary judgment. (Docket Item 51).

12. Docket Items 74 and 80.

13. Docket Item 75.

14. Docket Item 76.

15. The parties stipulated, with the approval of the Court, that Clifford E. Hall, Secretary of the Delaware Department of Highways and Transportation, be substituted as named defendant for Mr. Morris and that Messrs. Haber, Davidson, Bewick, Jr. and Hall are being sued only in their official capacities and

oral argument on May 8, 1975, and having given the parties a final opportunity to submit briefs, affidavits and any other documentation, the Court is now ready to rule on the outstanding motions.[16]

### I.

Defendants have moved for summary judgment on Counts I, III, IV and V of the complaint [17] as amended asserting that since the proposed road known as the Newark Beltway is not an undertaking of the federal government, the amended complaint fails to state a claim for declaratory or injunctive relief against them based upon 23 U.S.C. § 128,[18] 23 U.S.C. § 109(j),[19] 42 U.S.C. § 4332,[20] 49 U.S.C. § 1653(f)[21] and 23 U.S.C. § 138.[22]

---

not in their individual capacities. (Docket Item 83).

16. The Court takes judicial notice of the fact that William T. Coleman, Jr. is at present the Secretary of Transportation of the United States and he is automatically substituted as a party defendant pursuant to Rule 25(d), F.R.Civ.P.

17. The Court has subject matter jurisdiction of this case under 28 U.S.C. § 1331(a).

18. 23 U.S.C. § 128 reads in relevant part:

"(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, village, town, or village, either incorporated or unincorporated, shall certify to the [United States] Secretary [of Transportation] that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community.

\* \* \* \* \*

Such certification shall be accompanied by a report which indicates the consideration given to the economic, social, environmental, and other effects of the plan or highway location or design and various alternatives which were raised during the hearing or which were otherwise considered.

(b) When hearings have been held under subsection (a), the State highway department shall submit a copy of the transcript of said hearings to the [United States] Secretary [of Transportation], together with the certification and report."

19. 23 U.S.C. § 109(j) reads:

"(j) The [United States] Secretary [of Transportation], after consultation with the Administrator of the Environmental Protection Agency, shall develop and promulgate guidelines to assure that highways constructed pursuant to this title are consistent with any approved plan for the implementation of any ambient air quality standard for any air quality control region designated pursuant to the Clean Air Act, as amended."

20. 42 U.S.C. § 4332 reads in relevant part: "The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall—

(C) include in every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved."

21. 49 U.S.C. § 1653(f) reads in relevant part:

". . . After August 23, 1968, the [United States] Secretary [of Transportation] shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use."

22. 23 U.S.C. § 138 reads in relevant part: ". . . After the effective date of the

Plaintiffs oppose the motions for summary judgment on two grounds. Their first, and primary, contention is that the amended complaint states a claim for relief under the aforementioned statutes because of the actions taken by former United States Secretary of Transportation Brinegar, his predecessors in office, and other federal officials with regard to the proposed Newark Beltway pursuant to the Federal Aid Highway Act. The Court will discuss briefly the relevant portions of the Act[23] before examining the record in this case to evaluate plaintiffs' first contention.

Responsibility for the administration of the Federal Aid Highway Act is lodged with the Federal Highway Administration ("FHWA"),[24] and currently there are four separate "approvals" which a state[25] must obtain from the FHWA before it may be reimbursed under the Act for highway construction expenses. These are (1) "program approval," (2) "location approval," (3) "design approval," and (4) " 'P, S & E' approval."

"Program approval" involves cursory review by the FHWA of a "transportation program" that has been developed by a state highway department.[26] A "transportation program" is simply a study projecting expected future regional transportation needs, identifying numerous broadly aligned transportation corridors which could accommodate those needs, and perhaps suggesting that a highway could be constructed within one or more corridors. Since 1962 state highway departments have been delegating the major responsibility for devising "transportation programs" for urban areas of over 50,000 population to FHWA-funded local "metropolitan planning organizations" ("MPO") which continuously evaluate the future transportation needs of such areas using sophisticated computer processes.[27] The state highway department does receive funds directly from the FHWA for distribution to MPOs in the state, but its acceptance of such money does not obligate it to submit to the FHWA for possible "program approval" any "transportation program" that is proposed by a MPO.

After obtaining FHWA "program approval," the state highway department may decide to study further on its own[28] the possibility of building a particular highway that is suggested by a

---

Federal-Aid Highway Act of 1968, the [United States] Secretary [of Transportation] shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge, of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use."

23. 23 U.S.C. § 101 et seq. ("the Act").

24. See 49 CFR § 1.48(b). The FHWA is an "operating administration" of the Department of Transportation, 49 CFR § 1.3(b)(3), to which the Secretary of Transportation has delegated his responsibilities under the Act. 49 CFR § 145(a)(2), § 148(b).

25. The State Highway Department is the exclusive representative of a state in the vast majority of dealings with the FHWA concerning federal grant in aid under the Act. 23 U.S.C. § 302(a), 23 CFR § 1.3.

26. See 23 U.S.C. § 105(a), 23 CFR § 1.8.

27. 23 U.S.C. § 104(f)(1)–(4), § 307(c) [P.L. 87–866, 76 Stat. 1148]. The FHWA cannot approve a "transportation program" for an urban area of this size unless the "program" was developed by a MPO that utilized these computer processes. See 23 U.S.C. § 105(d), § 134(a).

28. The active research that the MPO engages in is confined strictly to the development of a "transportation program." However, the MPO may have to provide some type of formal "confirmation" to the FHWA just prior to FHWA "location approval" that a proposed highway route is consistent with the "transportation program" from which the route allegedly derives.

transportation corridor in the "program." If so and if at the same time the state highway department concludes that it does not want to preserve the possible option to receive reimbursement under the Act for appropriate future highway construction expenses [29] it is at least free to select an approximate highway route or location on the basis of pure engineering standards or other criteria mandated by state law, this selection process to be conducted in any manner that the state highway department chooses. But if the state highway department decides to preserve the possible option to receive reimbursement under the Act for appropriate future highway expenses, it must follow (at its own expense) certain FHWA required procedures which *inter alia* afford the public as well as other state and federal agencies the opportunity to provide input regarding the wisdom of building a highway vis-a-vis building other forms of transportation or of doing nothing at all, plus the opportunity to identify and comment upon the probable environmental, social, and economic consequences of several possible routes along which a proposed highway could be located within the transportation corridor.[30] The aim and inevitable result of these FHWA required procedures is that only at their close does the state highway department formally and conclusively decide that there is a real need for a highway within the transportation corridor and then select an approximate location or route of the proposed highway. The state highway department submits these two determinations to the FHWA for what is called "location approval."

If the FHWA grants "location approval," [31] it is then permissible for the state highway department to decide upon the essential design features of the FHWA-approved route. However, the state highway department must do so in accordance with federal procedures (again at the state's own expense) requiring it to solicit meaningful input with regard to the environmental impact of several alternative designs [32]

---

29. That is, the state highway department decides that a proposed highway or highways will be built solely with state funds.

30. These procedures [now codified in 23 CFR, Parts 790, 771 and 795 (39 Fed.Reg. 41805 et seq., effective November 29, 1974)] facilitate the FHWA's discharge of certain duties imposed upon the United States Department of Transportation by (1) 23 U.S.C. § 128, (2) 42 U.S.C. § 4332(2)(C), (3) 49 U.S.C. § 1653(f), (4) 23 U.S.C. § 109(j), and (5) 23 U.S.C. § 138. Basically the state highway department has a threefold responsibility under these FHWA procedures:
(1) It should hold a public "location hearing" (23 CFR § 790.5(a)) or carry out other informational measures pursuant to a previously FHWA-approved state Action Plan. (See 23 CFR § 790.2).
(2) In close cooperation and consultation with the FHWA, it must develop an environmental impact statement (EIS). The EIS takes into account all reasonable input and comments coming from the general public, state agencies, other federal agencies with expertise in environmental matters, the FHWA regional office, and the FHWA Office of Environmental Policy, in Washington, D.C.
(3) It must develop a Section 4(f) Statement if any of the proposed highway routes affect the use of sites covered by 49 U.S.C. § 1653(f) and 23 U.S.C. § 138, notes 21 and 22 *supra*. A Section 4(f) Statement normally is developed simultaneously with the EIS. 23 CFR § 771.19(g), (n).

31. Technically, the FHWA Division Engineer has the authority to grant "location approval." 23 CFR § 790.9(e). However, he may not do so unless and until:
(1) The Regional FHWA Administrator "concurs with" the conclusions reached in the EIS. (23 CFR § 771.14(b)). (In certain instances, one of which is when the state highway department has developed a Section 4(f) Statement, the FHWA Office of Environmental Policy in Washington, D.C. must also concur with the conclusions reached in the EIS. (23 CFR § 771.14(c)), and
(2) The FHWA Chief Counsel or his designee also "concurs with" the conclusions reached in the EIS.
In addition, the Federal Highway Administrator must first personally approve the contents of a Section 4(f) Statement and then make the determination required by 49 U.S.C. § 1653(f) and 23 U.S.C. § 138.

32. The state highway department should hold a public "design hearing" (23 CFR § 790.5(a)), or carry out alternative informational

and to conscientiously utilize such input when selecting a final design.

After the FHWA approves the proffered design (and the "supplemental environmental impact statement," if there is any), the state highway department prepares detailed engineering plans and construction estimates. If the FHWA is satisfied with these submissions, it grants " 'P, S & E' approval" [33] to the state highway department and thereafter executes a formal "project agreement" [34] which obligates the federal government to reimburse the state for the appropriate amount of construction expenses.[35]

It is clear that current FHWA regulations have established the aforementioned intricate procedures in order to ensure that the environmental consequences of a proposed highway potentially fundable under the Federal Aid Highway Act are intelligently, methodically, and seriously considered by federal authorities prior to the FHWA's granting of "location approval," that is, *well* before the state could conceivably begin any highway construction activities which upset the environmental status quo. These regulations fully effectuate the strong Congressional policy articulated in and implemented by 42 U.S.C. § 4332(2)(C), 49 U.S.C. § 1653

(f), 23 U.S.C. § 138, and 23 U.S.C. § 128 requiring that most federally funded activities, whether undertaken directly by a federal agency or jointly with the states through federal grants in aid, be planned so as to minimize adverse environmental consequences therefrom.

Because of the solicitude for the environment that these federal statutes express, courts have held [36] that if the FHWA granted "location approval" to a proposed highway before their effective dates, a state could not subsequently avoid complying with the applicable federal criteria by deciding to finance the proposed highway solely with state funds, since the FHWA's grant of location approval represented significant involvement of the federal government with the proposal. However, there would be little purpose served in irrevocably foreclosing the state's option to finance a proposed highway solely with state funds after the FHWA has granted "program approval" but prior to the FHWA's grant of "location approval" to a particular highway route. A transportation "program" is at best a very general description of a proposed highway network, providing insufficient information for the FHWA to develop the detailed EIS required by 42 U.S.C. § 4332(2)(C) or for the United States

---

measures pursuant to a previously FHWA-approved state Action Plan. (23 CFR § 790.2).

In addition, if it appears that any highway design under consideration might have a significant environmental impact that was not or could not have been identified and evaluated satisfactorily in the EIS prior to FHWA "location approval," the state highway department is required to submit a "supplemental environmental impact statement" for federal approval. 23 CFR § 771.14(i), 771.-15. This document is both developed by the state and approved by the federal government in the same manner as the "original" EIS.

33. 23 U.S.C. § 106. " 'P, S & E' " stands for "plans, specifications and estimates," these three terms constituting the formal caption of 23 U.S.C. § 106.

34. 23 U.S.C. § 110.

35. The amount of reimbursement varies according to the type of federal aid highway system which the particular highway "project" is scheduled to become a part of under the "project agreement." 23 U.S.C. §§ 103, 120.

36. *La Raza Unida v. Volpe*, 337 F.Supp. 221, 227, 231 (N.D.Cal.1971), *aff'd* 488 F.2d 559, 562–563 (C.A.9, 1973), *cert. denied* 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1138 (1974) (applying 23 U.S.C. § 128, 49 U.S.C. § 1653(f) and 23 U.S.C. § 138). *See also River v. Richmond Metropolitan Authority*, 359 F.Supp. 611, 632–634 (E.D.Va.1973), *aff'd* 481 F.2d 1280 (C.A.4, 1973) (per curiam) (dealing with 23 U.S.C. § 128, 23 U.S.C. § 138, and 42 U.S.C. § 4332(2)(C)) *Citizens for Balanced Environment & Transportation, Inc. v. Volpe*, 376 F.Supp. 806, 811–813 (D.Conn.1974), *aff'd* 503 F.2d 601 (C.A. 2, 1974) (dealing with 42 U.S.C. § 4332(2)(C)).

Secretary of Transportation to make the crucial Section 4(f) determination required by 49 U.S.C. § 1653(f) and 23 U.S.C. § 138.[37] Moreover, in practice the function of the "location hearing" held pursuant to 23 U.S.C. § 128 is simply to facilitate relevant public input prior to the completion of the EIS that is required by 42 U.S.C. § 4332(2)(C) and the Section 4(f) Statement that is required by 49 U.S.C. § 1653(f) and 23 U.S.C. § 138. Thus, "location approval" is the earliest most practical time at which the federal government can and should be held accountable for the proper discharge of its responsibilities under these four statutes.

 The same is true with respect to the duties imposed upon FHWA by 23 U.S.C. § 109(j). That provision requires the FHWA to develop guidelines to assure that highways *constructed* with federal funds are consistent with an approved plan for the implementation of air quality standards under the Clean Air Act. Thus, until the proposed highway is located, it is neither possible nor feasible for FHWA to make a fair and formal determination whether the highway will or will not meet the national standards for clean air.[38] In any event since the Clean Air Act in all likelihood would apply directly to most major highways that are constructed solely with state funds, the Court concludes that it would be erroneous to irrevocably brand a proposed state highway as a federal project before FHWA "location approval" so as to justify granting declaratory or injunctive relief based upon 23 U.S.C. § 109(j) or guidelines issued thereunder.

Plaintiffs contend that federal authorities have granted formal "location approval" to the Newark Beltway, or in the alternative that "location approval in fact" has occurred. With this contention and the above discussion in mind, the Court has reviewed the present record which describes in abundant detail the administrative history of the proposed Newark Beltway. From this record the following undisputed material facts are evident:

In 1964 the FHWA-funded New Castle County Land Use and Transportation Planning Program proposed the construction of a highway partially encircling the City of Newark ("Newark Beltway") which would be able to accommodate the increased traffic projected through 1985 in the Newark transportation corridor resulting from accelerated population growth and urbanization in that area.[39] The proposed

---

37. *Indian Lookout Alliance v. Volpe*, 345 F. Supp. 1167, 1169–1170 (S.D.Iowa, 1972), *aff'd* 484 F.2d 11, 18–19 (C.A.8, 1973). See also Statement of Norbert T. Tiemann, Federal Highway Administrator, 39 Fed.Reg. 41805 (December 2, 1974). It is thus irrelevant that either an FHWA approved or an FHWA unapproved transportation "program" was developed through a federally funded planning process such as by a metropolitan planning organization that is partially federally financed pursuant to 23 U.S.C. § 134. *See River v. Richmond Metropolitan Authority*, 359 F.Supp. at 636 n. 72. To hold otherwise would be to subject every highway somehow derived from a planning process funded in whole or in part with federal monies to the requirements of these statutes. See *Citizens for Balanced Environment and Transportation, Inc. v. Volpe*, 376 F.Supp. 806, 810, 811–813.

38. See 23 CFR § 771.18(i)(iv)(D).

39. The proposal was part of the 1985 Recommended Highway Plan for New Castle County which had been jointly developed with a Comprehensive Plan for New Castle County. Both "Plans" were apparently based on traffic and population projection studies that had been conducted by the Planning Program itself and by the Division of Urban Affairs, University of Delaware. (Docket Item 69A, at 2–9). The New Castle County Land Use and Transportation Program is a "metropolitan planning organization" that is financed partly with federal funds pursuant to 23 U.S.C. § 134, discussed at note 27 *supra* and accompanying text. It is now known as WILMAPCO (Wilmington Metropolitan Area Planning Coordinating Council). (Docket Item 94, at 4 [Affidavit of Chester D. Fulmer, Assistant Division Engineer, FHWA, Dover, Del.]).

After the New Castle County Land Use and Transportation Planning Program pro-

highway would begin at Ogletown, east of the City of Newark, as a so-called "major arterial" road, and run approximately 5 miles south and westerly somewhere along the City outskirts until Elkton Road, where it would narrow and change to a "minor arterial" road, then run north approximately 3 miles somewhere along the City outskirts crossing Nottingham Road and New London Road, and then continue in a general northeastern direction for another 4 miles or so to terminate near Polly Drummond Road just north of the University of Delaware campus. Along the southern outskirts of the City, the transportation "program" indicated that the "major arterial" portion of the Beltway could pass through or close to Rittenhouse Park, while along the western outskirts, the "minor arterial" portion could pass through or close to the Christine Manor neighborhood.[40]

In 1968 the Delaware State Highway Department[41] retained a consulting engineering firm to undertake location studies for the proposed Newark Beltway. By late 1969 the firm had formally identified and studied three alternate routes for the Ogletown to New London Road portion of the Beltway,[42] each route consisting of a "divided multi-lane arterial" road running from Ogletown to Elkton Road and an "undivided multi-lane arterial" road running from Elkton Road to New London Road. The State Highway Department realized that if the construction of this portion of the Newark Beltway were to be federally financed in the future as a "project" on the Federal Aid Primary System,[43] it would have to conduct a public

posed a Newark Beltway, the City of Newark Comprehensive Development Plan was published, also proposing that a Newark Beltway be constructed in accordance with the recommendations contained in the 1985 Highway Plan for New Castle County. The City of Newark Comprehensive Development Plan was drawn up under the supervision of the Delaware State Planning Office and was financed in part by federal grants from the United States Department of Housing and Urban Development under the provisions of Section 701 of the Housing Act of 1954. (Docket Item 69–A at 14–15; Docket Item 87, Exhibit M, Attachment #4).

The Delaware Department of Highways and Transportation (see note 41 *infra*) also operates a FHWA-financed computer system known as "Urban Planning System 360" which is able to project traffic patterns in the state through 1995. At one time this computer system confirmed the need for a Newark Beltway. (Docket Item 86, Affidavit of William A. Elgie, Chief, Unified Systems Planning for the Delaware Department of Highways and Transportation).

40. Until 1973, the New Castle County Land Use and Transportation Planning Program and its successor, WILMAPCO, retained the proposed highway partially encircling the City of Newark in the "Future Highway Plan for New Castle County." (Docket Item 92, Exhibit B.) In turn, the FHWA periodically "certified" the New Castle County Land Use and Transportation Planning Program and WILMAPCO. (Docket Item 86, Affidavit of Edward J. O'Donnell, Executive Director of WILMAPCO). This "certification" apparently constituted de facto FHWA "program approval" of the proposed highway for the purposes of 23 U.S.C. § 105(a).

41. Before January 1, 1971, the branch of Delaware state government responsible for the construction and supervision of state highways was the State Highway Department. 17 Del.C. §§ 111, 131 (1953 ed.). The State Highway Department was reorganized in 1970 into a Department of Highways and Transportation (57 Del.Laws, Ch. 514, § 1), with a new Division of Highways assuming most of the powers of the former State Highway Department. See 29 Del.C. §§ 8401, 8407 (1970).

Plaintiffs' amended complaint alleges that the United States Department of Transportation granted "location approval in fact" to the Beltway "by reason of the funding of the activities carried on by the *Delaware State Highway Department* in connection with said Beltway." (Emphasis added). However, in ruling on the defendants' motion for summary judgment, the Court has considered relevant evidence pertaining to the actions of the Department of Highways and Transportation as well as to those of the State Highway Department.

42. The highway proposed by the New Castle County Land Use and Transportation Planning Program in 1964 was somewhat longer, running from Ogletown to Polly Drummond Road.

43. (Docket Item 69, Item 1(b), DH's answers to interrogatories); (Docket Item 69–A).

location hearing. Consequently, a public location hearing was held on January 8, 1970, and on May 13, 1970 the State Highway Department officially adopted a route running from Ogletown to New London Road denominated "Alternative A."[44]

Thereafter, the State Highway Department apparently decided in earnest to preserve its option to receive federal reimbursement for the construction of "Alternative A." On April 8, 1971[45] the Division of Highways of the Delaware Department of Highways and Transportation[46] submitted a draft Environmental Impact Statement (Draft "EIS") covering the *Ogletown-New London Road* portion of the Newark Beltway to the FHWA division office in Dover, Delaware, and to certain local, state and federal authorities as required by contemporaneous FHWA procedures which had been promulgated a few months before.[47] Some of these authorities commented upon the draft EIS and on June 15, 1971 the DH submitted a

final EIS to the FHWA division office.[48] On June 22, 1971 the DH formally requested *location approval* from the FHWA division office for "Alternative A."[49] In September and November of that year the DH belatedly submitted to the FHWA division office a Section 4(f) Statement that was intended to evaluate the probable environmental impact of each of the three routes on Rittenhouse Park, which is located on the southern outskirts of the City of Newark; "Alternative A" would pass through approximately one acre of parkland in the northeast section of Rittenhouse Park.[50] The Draft EIS, the Final EIS and the Section 4(f) Statement were prepared solely with state funds.[51]

During the next twelve months the DH supplemented the Section 4(f) Statement,[52] but finally on December 7, 1972 the Regional FHWA Administrator "approved" the combination final EIS/Section 4(f) Statement.[53] In so far as he was concerned, the FHWA had thereby granted "location approval"

The Federal Aid Primary System was one of four federal aid systems established by Congress in 1958 (P.L. 85–767, 72 Stat. 887) defining the types of highways for the construction of which a state could receive federal grants-in-aid under the Federal Aid Highway Act.

44. Docket Item 69–A, at 33. The location hearing was held pursuant to FHWA Policy and Procedure Memorandum (PPM 20–8) that had been issued on January 14, 1969 in order to implement certain provisions of the Federal Aid Highway Act of 1968. (These provisions are now codified in 23 U.S.C. § 128, note 18 *supra*).

45. On March 25, 1971 WILMAPCO approved "Alternative A" "as being consistent with regional planning programs." (Docket Item 82 A, Exhibit C).

46. Hereinafter referred to as "DH."

47. FHWA Notice & Draft Instructional Memorandum, "Interim Guidelines for Implementation of Section 402[102](2)(C) of the National Environmental Policy Act of 1969" (November 30, 1970). The National Environmental Policy Act of 1969 became effective on January 1, 1970, but the first interim guidelines for its implementation were not issued by any federal agency until May 12, 1970 (*Interim Guidelines* issued by the

President's Council on Environmental Quality, 35 Fed.Reg. 7390).

48. The final EIS consisted of (1) a copy of the draft EIS, (2) a brief summary of comments concerning the probable environmental impact of the proposed Ogletown-New London Road portion of the Newark Beltway that either had been made at the January 8, 1970 public location hearing or had been received from various other sources, and (3) the DH's evaluation and disposition of these comments.

49. Docket Item 82A, Exhibit G.

50. Docket Item 87, Exhibit M. The DH should have prepared both the EIS and the Section 4(f) Statement at the same time. Department of Transportation Order 5610.1 (October 7, 1970).

51. Docket Item 86 [(1) Affidavit of the Chester D. Fulmer, Assistant Division Engineer, FHWA, Dover, Delaware; (2) Affidavit of Charles A. Stump, Chief of Administration, Delaware Department of Highways and Transportation]; Docket Item 94, Affidavit of Chester D. Fulmer, at 4.

52. The DH did so in response to criticism of its Section 4(f) Statement that was offered by a Deputy Assistant Secretary of the Interior. Docket Item 82A, Exhibit L; Docket Item 87, Addendum to Exhibit M.

53. Docket Item 82A, Exhibit M.

to "Alternative A." However, these "approvals" were merely tentative because under then existing United States Department of Transportation procedure, the United States Secretary of Transportation had to concur in the contents of the Section 4(f) Statement [54] before the FHWA could officially and formally grant "location approval" to "Alternative A."[55] In July 1973 the Deputy General Counsel of the United States Department of Transportation rejected the Section 4(f) Statement, thus precluding formal FHWA "location approval" to "Alternative A" or to the other two routes discussed in the Section 4(f) Statement.

During the nine month lapse between the Regional FHWA Administrator's tentative approval of the combination final EIS/Section 4(f) Statement (tentative grant of "location approval" to "Alternative A") and formal FHWA notice to the DH concerning the Deputy General Counsel's aforementioned rejection of the Section 4(f) Statement, there occurred a flurry of DH activities with respect to the Ogletown-New London Road portion of the Beltway.[56] For example, on January 25, 1973 the DH conducted a so-called public "design hearing" concerning proposed designs

for "Alternative A" from *Ogletown* to *Elkton Road.*[57] The FHWA division engineer in Dover had warned the DH that depending upon the outcome of the FHWA's and the Department of Transportation's official evaluation of the combination final EIS/Section 4(f) Statement, the DH might have to hold new design hearings "before approvals could be given." [58]

On August 7, 1973, still unaware of the rejection of the Section 4(f) Statement, the DH notified the FHWA division engineer in Dover that, based upon a revised study of New Castle County's long range transportation needs, the DH had decided to modify the June 22, 1971 request for "location approval" so that the DH was now requesting "location approval" just for the portion of "Alternative A" running from Ogletown to Elkton Road. The DH also enclosed "revised plans for the segment of this project ['Alternative A'] from S. Chapel Street to Elkton Road," and noted that "with the revised plan, a Section 4(f) Statement is no longer required and our previous submission is withdrawn."[59] In a letter dated August 13, the FHWA division engineer replied that "a new environmental impact statement should be pre-

54. That is, on the basis of the Section 4(f) Statement, he had to make the determinations required by 49 U.S.C. § 1653(f) and 23 U.S.C. § 138. Subsequently, the Secretary of Transportation delegated this responsibility to the FHWA Administrator. 23 CFR § 1.45(a)(4).

55. On December 13, 1972, the DH wrote the following letter to the FHWA division engineer in Dover. (Docket Item 87, Addendum to Exhibit M).
"This is to advise you that the acquisition of existing Rittenhouse Park lands as well as replacement lands (from Chrysler Corporation) will be accomplished entirely with State Funds.
 * * * * *
We hope the processing of the EIS/4(f) Statements can proceed promptly."

56. On February 18, 1972 the DH decided not to pursue further the drawing up of proposed routes for the New London Road-Polly Drummond Hill Road (also known as

Ebenezer Church Road) portion of the Newark Beltway. (Docket Item 93, Affidavit of Richard A. Haber, Director of Highways, Delaware Department of Highways and Transportation, ¶ 2; Exhibit A). Consequently, no public hearings have been held with regard to that proposed portion of the Beltway, and it is not presently included in the DH's Six Year Capital Improvement Plan pursuant to 29 Del.C. § 8407(b)(3). (Docket Item 93, Affidavit of Richard A. Haber, *supra*).

57. Apparently, proposed designs had been developed for only about half the length of "Alternative A," which in turn was still under FHWA/Department of Transportation study for possible "location approval." A public design hearing may occur only after the FHWA grants "location approval" to a particular route. See, e. g., PPM 20–8, ¶ 4(b) (January 14, 1969).

58. Docket Item 87, Exhibit P.

59. Docket Item 87, Exhibit I.

pared reflecting . . . ." that "Alternative A" had been changed.[60] On August 16, 1973, attempting to elaborate on the August 7 letter, the state again wrote to the FHWA division engineer, this time asserting that the DH would "recommend to the Highway Advisory Council[61] and WILMAPCO that the minor arterial segment of the Newark Ring arterial from Elkton Road to New London Road be deleted from the approved highway system in New Castle County," and that it would request the Highway Advisory Council to withdraw final right of way plans that had been submitted to New Castle County.[62]

On September 7, 1973 the FHWA division engineer returned the combination final EIS/Section 4(f) Statement to the DH along with a copy of the memorandum from the Deputy General Counsel, United States Department of Transportation, indicating official rejection of the Section 4(f) Statement. The DH informed the FHWA division engineer on September 18, 1973 that although it had decided to withdraw its request for "location approval" for the Elkton Road-New London Road portion of "Alternative A," it would retain the right of way "in that area" for state consideration.[63]

Thus, as of September 18, 1973 the FHWA had not formally and officially granted "location approval" to the DH for any portion of the proposed "Newark Beltway." Since then, because of amendments to the Federal Aid Highway Act which eliminated most of the funding for the federal aid highway category into which the proposed Newark Beltway best fitted,[64] the DH has decided not to seek in the near future any federal funds under the Federal Aid Highway Act for this proposed road.[65] The DH has made no attempt to prepare or submit a "new" or "revised" EIS or Section 4(f) Statement studying "Alternative A" from Ogletown west to Elkton Road, any other section of "Alternative A" or other conceivable routes for the Newark Beltway. Indeed, the state now avers that if and when the Newark Beltway or some por-

60. The letter stated that it was the FHWA's understanding that "Alternative A" had been modified "from Delaware Route 896 (Newark-Glasgow Road) to Delaware Route 2 (Elkton Road)." Docket Item 87, Exhibit R.

61. This body is established in 29 Del.C. § 8407 and has the responsibility of approving and adopting "all corridor route projects in connection with new road alignments." 29 Del. C. § 8407(b)(4). A "corridor route" is defined by 29 Del.C. § 8402 as:

" . . . any existing or proposed road in an urban or rural area which is classified as part of the 'principal arterial highway system' as defined in the National Highway Functional Classification Studies on record with the Department, and which serves traffic corridor movements of substantial statewide or interstate travel, and as to which the concept of service to abutting land is subordinate to the provisions of travel service to major traffic movements."

62. Docket Item 87, Exhibit T. The letter also reiterated the DH's withdrawal of the previous request for "location approval" of the Elkton Road-New London Road portion of "Alternative A" and stated that the DH would prepare a "revised environmental impact study."

63. The reason given in the letter (Docket Item 87, Exhibit S) for this apparent about face was that there was a "community desire for a road in the general location of the previously proposed arterial highway," that desire having been ascertained recently through meetings with both New Castle County and City of Newark officials.

64. The "Newark Beltway" is located within the boundaries of what is called the "Wilmington Urbanized Area" and under the present version of the Federal Aid Highway Act the DH could obtain only Urban System Funds for its construction. Urban System Funds have already been committed to other roads with higher priority through fiscal year 1976. (Docket Item 86, Affidavit of Richard A. Haber, dated June 13, 1974).

65. As of January 1974, the DH had not yet concluded that it would fund the South Chapel Street-Elkton Road portion solely with state funds. (At that time the DH stated that it "intends to submit environmental statements for portions . . . from South Chapel Street to Ogletown Road." [Docket Item 69, State's Answer to Interrogatories.])

tion or facsimile thereof is ever built, it will be constructed solely with funds supplied by the State of Delaware without any reimbursement under the Federal Aid Highway Act being contemplated or sought.[66]

 In sum, the Court must reject plaintiffs' contention that the Newark Beltway, any facsimile or portion thereof, has irrevocably become a federal undertaking due to alleged actions of several United States Secretaries of Transportation and their subordinates under the Federal Aid Highway Act. First of all, the FHWA has not granted the requisite "location approval," and according to current FHWA regulations it can not do so in the absence of an approved combination EIS/Section 4(f) Statement. Second, federal funding of WILMAPCO as well as of other state and local planning processes and agencies in Delaware is insufficient as a matter of law to irrevocably brand this or any proposed road a "major federal action" within the meaning of 42 U.S.C. § 4332(2) (C), a "program or project" within the meaning of 49 U.S.C. § 1653 (f) and 23 U.S.C. § 138, a "Federal-aid highway project" within the meaning of 23 U.S.C. § 128, or a "highway constructed pursuant to this title" within the meaning of 23 U.S.C. § 109(j). Thus, the Court cannot issue either declaratory or injunctive relief against the defendants based upon plaintiffs' contentions in order to rectify alleged violations of the aforementioned statutes.

## II.

The plaintiffs have advanced one other argument in support of their request for declaratory and injunctive relief. In this regard, plaintiffs maintain that even though the FHWA has not granted "location approval" for the Newark Beltway there are several so-called federal non-highway projects in the Newark area consisting of railroad underpasses, railroad overpasses, railroad at-grade crossings or other types of bridges [67] which have received formal FHWA approval equivalent to "loca-" tion approval," which are currently being constructed with federal funds or which are slated for such construction, and which will be or may be connected with the Beltway when that highway is built solely with state funds. However, nothing in the record in this case supports the plaintiffs' second argument:

(1) The DH has neither requested nor received any FHWA approval equivalent to "location approval" for the construction of any type of aforementioned project along any proposed route of the Newark Beltway.[68]

(2) Those Newark area railroad underpass projects, railroad overpass projects, railroad at-grade crossing projects, and bridge replacement projects which have received FHWA approval equivalent to "location approval" are not located within any proposed route of the Newark Beltway nor are they being designed or constructed so as to become an integral part of or in any way connected to a state funded Newark Beltway.[69]

---

66. The voluminous record in this case does not contain any letter from the DH to the FHWA specifically and formally withdrawing the request for "location approval" of the Ogletown to Elkton Road portion of "Alternative A," but it is obvious from the record, e. g., Docket Item 93, #1, (Affidavit of Richard A. Haber, filed May 22, 1975) and Docket Item 94, page 1 (Affidavit of Chester D. Fulmer, filed May 22, 1975) that the FHWA has not given formal location approval to any portion of the Newark Beltway.

67. See footnote 68 *infra*.

68. Affidavit of Richard Haber, at 3–4 (Docket Item 93) ; Affidavit of Chester D. Fulmer,

Assistant Division Engineer, FHWA Delaware Division, at 4. (Docket Item 94).

69. Affidavit of Chester D. Fulmer, (Docket Item 94, at 3–4). These Newark area non-highway projects are located at Ruthby Road and B & O Railroad (east of Newark and north of Ogletown) ; Cleveland Avenue and Delaware State Route 2 (just outside downtown Newark) ; Marrows Hill Road and Penn Central Railroad (along the eastern boundary of Newark well north of any possible route of the proposed Newark Beltway). Also, at present, all at-grade crossings of the Penn Central Railroad in Delaware are being eliminated pursuant to 23 U.S.C. § 322 (a).

■ Therefore, since the plaintiffs have presented no evidence tending to show that the FHWA has granted the equivalent of "location approval" to any possible component of a state funded Newark Beltway, their second argument also does not persuade the Court that they have stated a claim for which relief may be granted based upon 23 U.S.C. § 109(j), 23 U.S.C. § 128, 42 U.S.C. § 4332(2) (C), 49 U.S.C. § 1653(f), or 23 U.S.C. § 138.

### III.

For the foregoing reasons the Court will grant summary judgment dismissing the claims asserted in Counts I, III, IV and V of the complaint as amended seeking declaratory and injunctive relief based on alleged violations of 42 U.S.C. § 4332 (2) (C), 49 U.S.C. § 1653(f), 23 U.S.C. § 138, 23 U.S.C. § 128 and 23 U.S.C. § 109(j). This dismissal will leave pending only Count II of the amended complaint, over which the previously convened three judge district court has retained jurisdiction pending state court disposition.

An order will be entered in accordance with this opinion.